1

2

3

4                                UNITED STATES DISTRICT COURT

5                               NORTHERN DISTRICT OF CALIFORNIA

6

7    BOOBULI'S LLC,                              Case No. 20-cv-07074-WHO

8                    Plaintiff,

9            v.                                  **ORDER GRANTING DEFENDANT'S
                                                 MOTION FOR SUMMARY
10   STATE FARM GENERAL INSURANCE                JUDGMENT**
     COMPANY, et al.,
11
                     Defendants.
12

13           This action is based on plaintiff Boobuli's LLC ("Boobuli's") allegation that despite an

14   unavoidable decrease in its business operations due to the COVID pandemic in 2020 - 2021, its

15   insurer, defendant State Farm General Insurance Company ("State Farm"), failed to properly

16   adjust the premiums for its business risk insurance plans.[1]  Boobuli's brings equitable claims on

17   behalf of similarly situated California businessowners for violations of the Unfair Competition

18   Law, the covenant of good faith and fair dealing, and unjust enrichment.  Defendant State Farm

19   moves for summary judgment, or in the alternative, partial summary judgment, because it did

20   adjust rates, it suffered significant underwriting losses on its Businessowners policies during the

21   time period in question, and its premiums were approved by the Department of Insurance and were

22   not excessive.[2]  There is no material dispute regarding those facts, which defeat Boobuli's claims.

23   ───────────────

24   [1] Boobuli's also named State Farm Mutual Automobile Insurance Company ("State Farm
     Mutual"), State Farm's parent, as a defendant.  I dismiss it in this Order because Boobuli's has not
25   successfully pierced the corporate veil.  *See* Discussion, Section I.

26   [2] State Farm's Administrative Motion to Seal, Dkt. No. 88 (sealed), and Boobuli's Administrative
     Motion to Consider Whether Material Designated as Confidential by State Farm Should be Sealed,
27   Dkt. No. 86 (sealed) are both GRANTED.  The requests are valid under L.R. 79-5 in that the
     material they seek to seal contains confidential and sensitive business information, and the
28   requests are narrowly tailored.  *See Kowalsky v. Hewlett-Packard Co.*, 2012 WL 892427-LHK, at
     *2 (Mar. 14, 2012, N.D. Cal.).

United States District Court
Northern District of California

1    State Farm's motion is GRANTED.

2                                    **BACKGROUND**

3           Boobuli's is a California limited liability company that operated a café, Caffe California, in

4    Walnut Creek, California.  *See* Def.'s Motion for Summary Judgment ("Motion" or "Mot.") [Dkt.

5    No. 78] 4:28-5:3; *see also* Ana S. McLean Decl. ("McLean Decl.") [Dkt. No. 78-4], Ex. A ("T.

6    Moniz Dep.") at 35:2-20, 39:9-11.  State Farm and State Farm Mutual are engaged in the business

7    of marketing and selling insurance products in California and other states.

8           Boobuli's purchased business risk insurance from State Farm in 2019 and 2020.  *See* Debra

9    Billings Decl. ("Billings Decl.") [Dkt. No. 78-1] ¶ 6; *id.* Ex. 5 (documents filed by State Farm

10   showing copies of Policy No. 97-BU-J516-6, effective June 1, 2019, through May 31, 2020 (the

11   "2019 Policy"), and renewed through May 31, 2021 (the "2020 Policy")).  State Farm calculated

12   Boobuli's premiums for both plans based on a Delicatessen risk classification and personal

13   property of $84,100 for the 2019 Policy and $86,900 for the 2020 Policy.  *See* Billings Decl. ¶ 6.

14   Pursuant to California law, State Farm filed the rates it used to calculate premiums under the

15   Policies with the Insurance Commissioner, and the California Department of Insurance ("DOI")

16   approved them effective December 15, 2018.  *See* Order Denying Motion to Dismiss ("Prior

17   Order") [Dkt. No. 54] 15:1-3; *see also* Dkt. No. 23-1.

18          The 2019 Policy terminated on June 1, 2020, and the 2020 Policy covered June 1, 2020,

19   through May 31, 2021.  *See* Billings Decl. Exs. 1, 2.  Boobuli's policy renewed on June 1, 2021,

20   but Boobuli's terminated it after two months on August 1, 2021.  *See id.* Exs. 3, 4. [3]

21          In March 2020, the State of California recognized the public health crisis caused by the

22   COVID pandemic.  Mandatory shutdowns followed, and Boobuli's closed its café in Walnut

23

24   ───────────────
     Since I do not rely on any of the sealed material in this order, I will not seal the order itself.

25   [3] State Farm's request for judicial notice is GRANTED.  Dkt. No. 79.  Because Boobuli's
     insurance policies and the Insurance Commissioner's Bulletins are referred to in the SAC,
26   Boobuli's predicates its claims on them, and because they are not reasonably subject to dispute, I
     take judicial notice of them.  *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005)
27   (incorporation by reference doctrine extends "to situations in which the plaintiff's claim depends
     on the contents of a document, the defendant attaches the document to its motion to dismiss, and
28   the parties do not dispute the authenticity of the document, even though the plaintiff does not
     explicitly allege the contents of that document in the complaint").

United States District Court
Northern District of California

1    Creek, California for three months.  It reopened in June 2020, with reduced hours and employees.

2    *See* Pl's Opposition ("Oppo.") [Dkt. No. 83] Exs. H-J (Profit and Loss Statements); Oppo. Ex. K

3    (M. Moniz Depo.) at 21:23-22:12; 24:19-22; *id.* Ex. G (T. Moniz Depo.) at 47:19-48:9

4            On April 13, 2020, the DOI issued a Bulletin to insurers recognizing that "the COVID-19

5    pandemic caused an unprecedented challenge for California's businesses" and that statewide and

6    local stay at home orders had "severely curtailed activities of policyholders in both personal and

7    commercial lines," such that "projected loss exposures of many insurance policies have become

8    overstated or misclassified."[4]  SAC Ex. A at 1.  Considering these circumstances, the April 2020

9    bulletin informed insurers that "Commissioner Lara . . . orders insurers to make an initial premium

10   refund for the months of March and April to all adversely impacted California policyholders,"

11   including those in commercial liability insurance, "as quickly as practicable but no later than 120

12   days after the date of this Bulletin."  *Id.*

13          Commissioner Lara granted insurers "reasonable flexibility in determining how best to

14   quickly and fairly accomplish the refund of premium to policyholders," and provided that

15   "[i]nsurers may comply with the premium refund order by providing a premium credit, reduction,

16   return of premium, or other appropriate premium adjustment." *Id.* at 2.  The Bulletins further

17   stated that, "[i]nsurers may refund premium without prior approval by the [DOI] if they apply a

18   uniform premium reduction for all policyholders in an individual line of insurance, for recent,

19   current, and upcoming policy periods or any portion thereof." *Id.*  "Alternatively, insurers may

20   refund premium without prior approval by the [DOI] by reassessing the classification and

21   exposure bases of affected risks on a case-by-case basis for recent, current, and upcoming policy

22   periods or any portion thereof." *Id.* at 3.

23          The bulletin further stated that "[w]hether choosing one of the above-described

24   approaches, or an alternative approach, insurers shall, no later than 120 days after the date of this

25   Bulletin, provide each affected policyholder, if applicable, with a notification of the amount of the

26   refund, a check, premium credit, reduction, return of premium, or other appropriate premium

27

28   [4] Boobuli's request for judicial notice is granted for the same reasons stated *supra* n. 3.  Dkt. No.
     85.

United States District Court
Northern District of California

3

1    adjustment." *Id*.  Commissioner Lara also ordered every insurer to report to the DOI within 60

2    days "all actions taken and contemplated future actions to refund premiums in response to or

3    consistent with this Bulletin." *Id*.

4          The DOI issued a second Bulletin to insurers on May 15, 2020, stating that "the directives

5    set forth in [the April 13] Bulletin to reduce premium in the affected lines of insurance where the

6    projected loss exposures have become overstated or misclassified are hereby extended through

7    May 31, 2020," and providing that the required report by insurers to the Department "shall also

8    include information with respect to any premium adjustments for May 2020."  SAC Ex. C at 2.

9    On June 25, 2020, the DOI issued a third Bulletin to insurers, which extended the directives and

10   reporting requirements of the prior two Bulletins to June 2020, and to "any months subsequent to

11   June if the COVID-19 pandemic continues to result in projected loss exposures remaining

12   overstated or misclassified."  *Id*. Ex. D.  It also called for additional reports to the DOI.  The June

13   25 Bulletin reiterated that "[t]he extension of reporting required by this Bulletin 2020-8 does not

14   change the previous deadline for insurers to provide direct relief to policyholders for March, April,

15   and May premiums by no later than August 11, 2020." *Id.*

16          Finally, on December 3, 2020, the DOI issued an amended version of the June 25, 2020,

17   Bulletin, which further extended the premium return and adjustment orders of the previously

18   issued Bulletins.  *Id.* Ex. F.

19          In response to the earlier Bulletins, in June 2020, State Farm reported to the DOI that it

20   would apply a "uniform reduction of 40% of the rated liability exposure amount for all

21   [Businessowners policy] customers, for one annual renewal cycle," with "a target effective date of

22   September 15, 2020 for new and renewal businesses."  SAC Exs. B, E.  This announcement also

23   stated that those "[c]ustomers [did] not need to take any action [and]. . . [e]xcept for minimum-

24   premium policies, billing notices for the annual renewal cycle beginning with new and renewal

25   effective dates of September 15, 2020 will reflect the impact of the reduction in rated liability

26   exposure." SAC Ex. B.

27          Booobuli's received this 40% reduction upon its renewal on June 1, 2021, until August 1,

28   2021, when it cancelled its policy.  *See* Billings. Decl. Exs. 3, 4; Oppo. 27:1-7 ("Booobuli's did not

1    receive the full twelve months of premium credits . . . [and if] Booboli's [had] not renewed on

2    June 1, 2021, [it] would have received no premium credits or refunds[.]"); *see also* Tr. of

3    Proceedings from December 20, 2023 [Dkt. No. 96] at 4:6-10, 5:5.

4         State Farm also stated that "for all customers whose policies terminate between March 20

5    and August 31, 2020, [State Farm] will return 25% of the premium owed for coverage that was in

6    force during the period of March 20 to May 31." SAC Ex. B.  It issued the same response to the

7    2020-8 Bulletin.  *See* SAC Ex. E.

8         On March 11, 2021, the DOI issued Bulletin 2021-03.  *See* Dkt. No. 45-1 (Bulletin 2021-

9    03 from California Insurance Commissioner Ricardo Lara).  This Bulletin discussed the efficacy

10   of the prior DOI orders at returning premiums to customers.  *Id.*  It stated: "[t]o date, private

11   passenger automobile insurance companies have returned more than $1.75 billion in premium for

12   2020 to California drivers," but "based on extensive analysis of data received, the Department's

13   review of this loss data demonstrates the premium relief that insurance companies provided to

14   their policyholders was insufficient, leaving consumers paying inflated premiums while they

15   continue to experience reduced risk of loss." *Id.*  Bulletin 2021-03 instructed insurance companies

16   (not just auto insurance companies, but "all admitted and non-admitted property & casualty and

17   workers' compensation insurers") to "[d]o more to return additional premium relief from March

18   2020 forward, and report these additional premium returns to the Department, commensurate with

19   continuing reductions in the exposure to loss for particular lines of insurance." *Id.*

20        Booboli's brought this suit on October 9, 2020, alleging that State Farm's conduct violated

21   the unfair prong of California's Unfair Competition Law ("UCL") and the implied covenant of

22   good faith and fair dealing, and that State Farm was unjustly enriched.  I denied State Farm's

23   motion to dismiss Booboli's first amended complaint, giving Booboli's leave to amend the part of

24   its complaint that insufficiently named State Farm General's parent company, State Farm Mutual,

25   as a defendant in the case.  *See generally* Prior Order.  Booboli's filed the operative second

26   amended complaint in October 2021.  State Farm now moves for summary judgment on each of

27   Booboli's claims and for dismissal of State Farm Mutual as a defendant.

28

United States District Court
Northern District of California

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Throughout this litigation, Boobuli's' case has relied on the theory that during the COVID pandemic, State Farm accrued excess profits because it failed to adequately adjust the plaintiff's premiums to account for reduced risk. State Farm established during discovery that it experienced underwriting losses on its Businessowners policies ("BOPs"), not excessive profits, during the COVID pandemic. Boobuli's' expert evaluated State Farm's profits considering solely liability coverage, not property loss coverage, and concluded that State Farm experienced profit. *See generally* Decl. of Peter Scourtis in Opposition to Defendants' Motion for Summary Judgment ("Scourtis Decl.") [Dkt. No. 84]. Because State Farm's BOPs cover both liability and property loss, the data presented in Boobuli's' expert's report paints an incomplete picture. I discount it. There is no dispute that State Farm suffered underwriting losses in BOPs covering *both* liability

6

1    and property.[5]

2    In opposing summary judgment, Boobuli's challenges the way State Farm distributed its

3    refunds and rate reductions, argues that its profits during COVID should be calculated considering

4    liability only, states that State Farm did not provide the adjustments to enough businesses, and

5    posits that the approved ratemaking regime for BOPs failed to account for COVID-related changes

6    in risk assessment.  Critically, it acknowledges that it received the premium relief promised by

7    State Farm—a 40% reduction in rated liability exposure upon renewing its policy on June 1, 2021.

8    It has not produced evidence that State Farm either (1) failed to give Boobuli's anything to which

9    Boobuli's was entitled under California law, or (2) retained any excess profits to which it was not

10   entitled.  State Farm has shown that it calculated Boobuli's' premiums prior to COVID in a

11   manner that was approved by the DOI, that the factors that determined those premiums did not

12   change during COVID, and that it suffered underwriting losses rather than earned excessive profits

13   on the BOPs during the pandemic.  These undisputed facts are fatal to each of Boobuli's' claims.

14   **I.      STATE FARM MUTUAL MUST BE DISMISSED**

15   As a preliminary matter, only State Farm is a proper defendant.  A parent corporation is

16   not generally liable for the acts of its subsidiaries.  *See U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998).

17   To establish alter-ego liability, and pierce the corporate veil, Boobuli's needed to establish that (1)

18   "there is such unity of interest and ownership that the separate personalities of the ... entities no

19   longer exist;" and (2) "failure to disregard their separate identities would result in fraud or

20   injustice." *Williams v. Progressive Cnty. Mut. Ins. Co*., 2019 WL 1434241, at *2 (S.D. Cal. Mar.

21   29, 2019) (quoting *Ranza v. Nike, Inc*., 793 F.3d 1059, 1073 (9th Cir. 2015)).  Boobuli's named

22   both State Farm, with whom it contracted for insurance, and State Farm Mutual, the parent, as

23   defendants.

24   Boobuli's shows that State Farm is a wholly owned subsidiary of State Farm Mutual.  *See*

25

26   ──────────────────────

27   [5] Boobuli's objects to several aspects of Nancy Watkins' expert declaration; specifically, it objects to: Watkins Decl. [Dkt. No. 78-3] 7:15-20; 9:23-10:2 (sic); 10:6-10; 10:11-17; and 10:17-20.  *See* Oppo. 28-30.  Because I do not rely on any of the statements that Boobuli's objects to in resolving the motion for summary judgment, I will not rule on the merits of its objections.

28

SAC Ex. G (State Farm General Insurance Company Annual Statement for 2020); Ex. H (Choice of Administrative Law Judge based on public hearing concerning State Farm's rate application, stating that "State Farm General 'has no employees of its own' and 'is managed by State Farm Mutual's employees.'"); *see also* Pl's Request for Judicial Notice [Dkt. No. 87-1] Ex. 1 at 97 (document suggesting that in 2020, State Farm reported that it was 100% owned and "Directly Controlled by" State Farm Mutual.)  While this shows unity of interest and ownership, it does not show how a failure to disregard the separate identities of State Farm and State Farm Mutual would result in fraud or injustice, which is the second element of alter ego liability.  Boobuli's made no effort to do so.  There is no evidence that State Farm is inadequately capitalized.  And at oral argument, Boobuli's appeared to concede that its alter ego theory of liability lacked sufficient proof.  *See* Tr. of Proceedings on December 20, 2023 [Dkt. No. 96] 18:7-24.

Without any showing from Boobuli's of how an inequitable result would arise from proceeding against State Farm alone, its alter ego theory of liability cannot proceed.  *See Sonora Diamond Corp. v. Sup. Ct*., 83 Cal. App. 4th 523, 525 (2000) (holding that both factors, meaning both a unity of interest and an inequitable result if the acts in question are ascribed only to the subsidiary, for alter ego liability to be found).  State Farm Mutual is DISMISSED.

## II.      NONE OF BOOBULI'S' CLAIMS HAS MERIT

There are a number of reasons why Boobuli's has failed to show a dispute of material fact on any element necessary to support any claims.  The essential defect in its case is that it cannot show that State Farm's conduct was unfair or inequitable.

### A.      Boobuli's Cannot Challenge Rates Already Approved by the DOI.

To start, and as I explained in the Prior Order denying State Farm's motion to dismiss, Boobuli's cannot challenge premium rates that were already approved by the California DOI.  *See* Prior Order 9-18; Cal. Ins. Code § 1860.1 ("[n]o act done . . . pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution of civil proceedings under any law of this State heretofore or hereafter enacted which does not specifically refer to insurance.").  The California Supreme Court has been clear that the sections of the California Insurance Code that govern premium rate setting immunize acts are "affirmatively authorized" by

United States District Court
Northern District of California

1  those provisions, not acts that are "merely regulated" by them.  *See Villanueva v. Fid. Nat'l Title*

2  *Co.*, 11 Cal. 5th 104, 116 (2021); *see also* Prior Order 14.

3      This means that court afforded relief—like restitution under the UCL—may be available

4  where an insurer has *misapplied* DOI-approved premium rates, but it is not available to challenge

5  the rates themselves.  A permissible "misapplication" challenge is one that can be addressed

6  without contemplating changes to the underlying approved plan.  *See* Prior Order 15.  *MacKay v.*

7  *Superior Court* is instructive.  There, the plaintiff challenged particular rating factors used by an

8  automobile insurer, and the record revealed that those rating factors were approved by the DOI.

9  *See MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (*as modified*).  The California

10  Court of Appeal considered "whether the approval of a rating factor by the DOI precludes a civil

11  action against the insurer challenging the use of that rating factor," and concluded that "it does."

12  *Id.* at 1434, 1443.

13      Insurance Code section 1860.1 is to be narrowly construed, however, and "does not bar

14  private actions to enforce the Unfair Competition Law."  Insurance Commissioner Response, Dkt.

15  No. 61 in Case No. 20-cv-06789-EMC at 2.  Courts in the Ninth Circuit have held that so long as

16  the challenge is directed at the insurer's "allegedly unfair conduct" in violation of the UCL and not

17  "at the Commissioner's rate," then the challenge is permissible.  *See Wahl v. Am. Sec. Ins. Co.*,

18  2010 WL 4509814, at *2-3 (N.D. Cal. Nov. 1, 2010).  Such challenges can only address insurers'

19  actions taken outside of the authority of the Insurance Code.  *See id.*, at *3 (quoting *MacKay*, 188

20  Cal. App. 4th at 1449) ("Insurance Code section 1860.1 protects from prosecution under laws

21  outside the Insurance code only acts done, actions taken and agreements made pursuant to the

22  authority conferred by the ratemaking chapter. It does not extend to insurer conduct not taken

23  pursuant to that authority.") (alterations and internal quotation marks omitted).

24      Boobuli's insists that it does not challenge State Farm's DOI-approved rates, only their

25  application.  This was true of the FAC.  *See* Prior Order, 15:1-8 (finding that "this lawsuit

26  challenges State Farm's misapplication of approved rates in the present COVID-19 circumstances,

27  not an act affirmatively authorized by the Insurance Commissioner.").  And the SAC asserts the

28  same; Boobuli's allegations were limited to what it claimed to be the negative effects of State

1    Farm's method of applying its premiums and not how State Farm set those premiums.[6]

2         But in its Opposition, Boobuli's veers into challenging the ratemaking process, which is

3    outside of this court's jurisdiction.  Boobuli's challenges State Farm's assertion that it uses

4    personal property as the exposure base to determine risk assessment and Boobuli's' premium; it

5    claims that State Farm considers more than just personal property when rate setting.  *See* Oppo.

6    13-15.  But State Farm has shown that, per DOI instructions, it could only establish Boobuli's

7    premium rates considering one exposure base: personal property.  *See* Watkins Rebuttal [Dkt. No.

8    89-2] 4:1-21; Dkt. No. 23-1, at 20 (Classification Index for State Farm rate plan specifying

9    personal property as sole applicable rate base for Delicatessens).  And because the DOI approved

10   State Farm's process, Boobuli's cannot challenge it in this forum.

11        Boobuli's tries to frame its arguments as challenges to the efficacy of using a personal

12   property rating basis to account for changes in the "nature of the exposure" due to COVID-19

13   related shutdowns; it does so seemingly in an attempt to make this a misapplication challenge.

14   Oppo. 14:6-16.  It states that, "[a]t a minimum, a triable issue exists as to the methodology used to

15   provide coverage with a [personal property] exposure base."  *Id.*

16        But these arguments challenge what State Farm considers when *establishing* its rating plan,

17   not its methodology in *applying* its preapproved rate.  *See id.* 15:8-16 ("[t]he risk factor used to

18   calculate premiums is a proxy for the multitude of factors used to develop the number . . . [t]he

19   COVID-19 pandemic fundamentally changed the risks insured against under the policy, such that

20   the [personal property] exposure base was no longer a representative proxy for coverage.").  It

21   would be impossible to respond to such a challenge without changing the underlying, approved

22   rate plan, which gives State Farm no discretion to apply any exposure base other than personal

23

24   _____

     [6] In the SAC, Boobuli's alleged that "State Farm is aware that the shelter-in-place orders, social
25   distancing guidelines, and resulting reduction in business activity has substantially reduced or
     eliminated insured business operations through California," yet "State Farm continued to collect
26   and retain excessive, unfair premiums from Boobuli's and other businesses."  SAC ¶¶ 40-41.  It
     alleged that "State Farm's *conduct* contravenes the law and public policy, is unfair to
27   policyholders, results in arbitrary insurance practices, interferes with a competitive insurance
     marketplace, and denies fair, available, and affordable insurance for all Californians."  *Id.* ¶ 11
28   (emphasis added).

1   property.

2         The California Supreme Court was clear in *Villenueva* that acts that are "affirmatively

3   authorized" by the Insurance Code are immunized from judicial review.  *Villanueva v. Fid. Nat'l*

4   *Title Co.*, 11 Cal. 5th at 116.  Those challenges are within the exclusive jurisdiction of the DOI

5   and not suitable for resolution by this court.  To the extent that Boobuli's makes these challenges,

6   I will not review their merits.

7         **B.**     ***Lara* Held That the DOI Commissioner Cannot Order Retroactive Relief.**

8         State Farm argues that the 2021 California Court of Appeal decision in *State Farm*

9   *General Insurance Company v. Lara* prevents Boobuli's from recovering under any of its causes

10   of action because retroactive premium refunds are inconsistent with California's "prior approval"

11   statutes and because the court in *Lara* held that the California Insurance Commissioner cannot

12   order a retroactive rate decrease and a corresponding retroactive premium refund.  Mot. 17; *see*

13   *State Farm General Insurance Co. v. Lara*, 71 Cal. App. 5th 148 (2021).  The decision in *Lara*

14   was issued after I denied State Farm's motion to dismiss on October 5, 2021, so I did not consider

15   it in determining that Boobuli's had plausibly alleged its claims.  I will consider it now.

16         *Lara* arose after State Farm sought a writ of mandate from the Insurance Commissioner's

17   orders on its application for premium rate increase, which directed State Farm to decrease its rate

18   retroactively and order refunds.  *See Lara*, 71 Cal. App. 5th 148.  The superior court issued a

19   peremptory writ of mandate setting aside the Rate Order and remanding the remaining issues to

20   the Commissioner.  The Commissioner appealed, arguing that he had properly interpreted the

21   statute and regulation and had the authority to set an earlier effective date and require refunds.

22   *Lara*, 71 Cal. App. 5th 148, 159.  The California Court of Appeal affirmed the lower court's

23   holding, finding that the Insurance Code's "prior approval requirement is *prospective* in operation

24   and inconsistent with retroactive rates and refunds."  *Id.* at 188 (emphasis added).

25         I agree with the courts in this circuit that have determined that *Lara*, while it does prevent

26   the Commissioner from ordering retroactive relief, does not preclude federal courts from affording

27   relief under the UCL.  *See, e.g. Rejoice!*, 2021 WL 5879118, at *8 (where the Hon. Edward Chen,

28   in the wake of *Lara*, allowed the plaintiff's UCL claim to proceed against its insurer, noting that

"approval of a given rate by the Commissioner does not necessarily foreclose the possibility that the approved rate can be improperly applied"); *Blain v. Liberty Mutual Fire Insurance Company*, 2023 WL 2436003 (S.D. Cal. Mar. 9, 2023) (where the court found that "[the] Plaintiff's challenge is to [the insurer's] application of approved rates, not to the rates themselves, and therefore will not require the Court to partake in any complex calculations that would require the expertise of the DOI" and that "it is well within the Court's purview to determine the case at bar.")  There is disagreement.  *See e.g. Torrez v. Infinity Ins. Co.*, 2022 WL 6819848 (C.D. Cal. Oct. 11, 2022).  But even in *Torrez*, the court considered the possibility that the Insurance Commissioner may still have the power to create an exception to the prior approval system; it ultimately decided to abstain from issuing an equitable remedy under the UCL because the "pleadings alone" showed that the plaintiff was asking the court to "engage in a technical inquiry," meaning an evaluation of the sufficiency of the insurer's premium adjustments in the wake of COVID.  It decided that the Insurance Commissioner was better equipped to ascertain whether insurer's actions were fair.  *Id.* at 4-5.  But as the Hon. Anthony Battaglia reasoned in *Blain*, "[t]he questioning of the Commissioner's authority in *Lara*, coupled with the Commissioner's own statements regarding the authority of the courts to adjudicate the type of claims presently at bar, persuades the Court that even if Plaintiff's claims were brought before the DOI, it is likely the case would ultimately return to this court, creating an unnecessary detour[.]" 2023 WL 2436003, at *6.

Boobuli's is not precluded from adjudicating a UCL claim based on misapplication of approved rates. [7]  But it may not challenge the approved rates themselves or how State Farm determines them.  *See supra* II(A).  To the extent Boobuli's does challenge the rates themselves rather than their application, its arguments fail as a matter of law.

**C.     State Farm Provided the Plaintiff with the 40% Discount Upon Renewal.**

State Farm provided Boobuli's with premium relief in the wake of the pandemic.  This fact, absent from the pleadings, undercuts Boobuli's' claims.

---

[7] As I am granting State Farm's motion for summary judgment as to Boobuli's breach of implied covenant and unjust enrichment claims for other reasons, I will not reach the question of whether *Lara* would prevent the plaintiff from recovering under those causes of action as a matter of law.

In the SAC, Boobuli's insisted that State Farm never gave the premium reduction that it promised. *See* SAC ¶ 42 ("failure to return or appropriately adjust business owners' premiums has resulted in State Farm collecting and retaining excessive premiums in violation of California public policy[]"); *id.* ¶ 52 ("Despite a dramatic decrease in its California policyholders' insured business operations caused by the COVID-19 pandemic, State Farm has (1) failed to make premium adjustments and returns, and (2) continued to collect premiums on rates approved prior to the unforeseen pandemic-related reduction in business operations."). But in its Opposition, Boobuli's acknowledged that it did receive the promised 40% adjustment of its rated liability exposure for its coverage between September 15, 2020, and September 15, 2021 when it renewed its policy on June 1, 2021. *See* Oppo. 27:5-8 ("[h]ad Boobuli's not renewed on June 1, 2021, [it] would have received no premium credits or refunds because any policyholder whose policy lapsed after August 31, 2020, received no premium adjustment[]"); *see also* Billings Decl. Exs. 3, 4 (showing that Boobuli's renewed its policy on June 1, 2021, and cancelled the same policy on August 1, 2021); *see also* SAC Exs. B, E (showing that State Farm General reported to the DOI that it would apply a "uniform reduction of 40% of the rated liability exposure amount for all [Businessowners policy] customers, for one annual renewal cycle," with "a target effective date of September 15, 2020 for new and renewal businesses."); *see also* Tr. of Proceedings from December 20, 2023 [Dkt. No. 96] 4:6-10, 5:5.

### D. The Businessowners Policies Were Rated on Personal Property Exposure Base That Was Properly Set Prior to COVID-19 and Did Not Change.

It also matters that State Farm used approved rating factors to calculate Boobuli's premiums. COVID did not affect those factors.

It is undisputed that Boobuli's premium rate was properly set and approved by the DOI effective December 15, 2018, prior to the COVID-19 pandemic. *See* Prior Order 15:1-3; RJN, Ex. D at 5-11. This rate was assessed using a personal property exposure basis. It is also undisputed that Boobuli's personal property did not change during the pandemic. *See* Mot. 26:16-28; *see also* Billings Decl. ¶ 9; McLean Decl., Ex. B (M. Moniz Dep.) at 34:2-13; McLean Decl., Ex. A (T. Moniz Dep.) at 60:7-20.

13

United States District Court
Northern District of California

Boobuli's argues that personal property was not the only exposure base that State Farm considered when setting premium rates for its BOPs.  Oppo. 13-15.  It points out that State Farm also considered, pursuant to its approved rate plan, "the policy limits, building construction, zone, subzone, and credit or debit adjustments."  *See* Billings Decl. ¶ 7.  It contends that State Farm should have adjusted its premiums when those other factors changed due to COVID-19 shutdowns.  Oppo. 13:9-12.

Booubli's posits that State Farm wrongfully "assumes that the [personal property] exposure basis used for delicatessens does not account for any risks other than coverage for personal property of the insured."  *Id*.  It says that State Farm ignored the way that the "underlying nature of the exposure fundamentally changed in a way which was not predicable at the inception of the policy."  *Id.* 14:5-7; Scourtis Decl. ¶ 17.  Since the BOPs provide "property and liability coverage," *see* Billings Decl. Exs. 1-3, and the COVID-19 pandemic "fundamentally changed the risks insured against under the policy," Booubli's argues that the exposure base that State Farm used to calculate premium rates was "no longer a representative proxy for coverage."  Oppo. 14:12-16 (citing Scourtis Decl. ¶ 36-37).

By arguing that State Farm considered more than just personal property in determining its premium rates, and that those rates were therefore wrongly calculated because of intervening forces related to the pandemic, Booubli's challenges how State Farm did ratemaking.  This is the improper venue for that challenge.  It is true that the 2019 Policy and the 2020 Policy covered both property and liability.[8]  But this does not change that State Farm calculates its premiums, in accordance with its DOI-approved strategy, utilizing the insured party's personal property on the insured premises as the rate basis.  Nor does State Farm considering other factors like "'policy limits, building construction, zone, subzone, and credit or debit adjustments[,]'" in rate setting change that fact or convert Booubli's challenge into a misapplication challenge.  *See* Oppo. 15:4-

---

[8] This is something that Booubli's' expert seems to forget when assessing State Farm's underwriting profits over his proposed COVID Impact Period; there, he considers only liability coverage.

11 (quoting Billings Decl. ¶ 7).[9]

### E.   State Farm's Filings with the DOI Show That it Experienced Underwriting Losses During the Class Period, Ultimately Justifying a Rate Increase.

California state law imposes guidelines around the premiums that insurers may charge within the state; these guidelines are designed to prevent insurers from imposing "excessive" rates, which are rates that are "expected to yield the reasonably efficient insurer a profit that exceeds a fair return on the investment used to provide the insurance." *See* Cal. Code Regs. Tit. 10, § 2642.1.  The Insurance Commissioner determines whether a rate is excessive at any given point by considering the "competing interests of consumers in lower prices" and of "investors in prices that yield high returns." *Id.*  California ratemaking procedures dictate that the minimum rate of return for an insurer is -6% and the maximum rate of return is +6% plus the risk-free rate, in the prospective period; this prevents undue risk of insolvency and prevents injury to competition.  *See* Cal. Code Regs. Tit 10 § 2644.16.

Nancy Watkins, State Farm's expert, found that State Farm experienced underwriting losses, not "excessive profits," over the relevant period.  *See* Watkins Decl. 24:1-4.  Her report shows that State Farm's average ultimate loss and Defense Cost Containment Expense ("DCCE") ratios for its California Businessowners policy program worsened after March 2020.  Watkins Decl. 22-24.  Loss ratios are the relationship between how much an insurance company spends on paying claims versus the premium the insurance company receives.  It is undisputed that the loss ratio needs to be "below 63%" for State Farm General to "earn an underwriting profit." *Id.*   For the three-year period before the pandemic, the ratio was approximately 60%.  Between April 2020 and June 2022, the ratio averaged between 75% and 84%.  *Id.*

Boobuli's disputes the proper duration of the COVID Impact Period for the purposes of evaluating State Farm's relevant financial performance.  At oral argument, its counsel argued that disputes about the class period were sufficient to preclude summary judgment.  But there is no

---

[9] Similarly, Boobuli's protests that State Farm has submitted "no evidence in support" of its claim that personal property is the "sole factor being analyzed in determining the premium owed." Oppo. 14:23-27.  It does not need to.  The way State Farm does ratemaking is not the concern of this court.

dispute about the class period.  In the SAC, the plaintiff proposed that the class period "cover[] any period from March 16, 2020, through the present []"  SAC ¶ 82.  The SAC was filed in October 2021.  State Farm does not appear to take issue with that proposed class period.  *See generally* Mot.  What the parties do dispute is what the proper "COVID Impact Period" is.

Boobuli's expert says that the COVID Impact Period should be a "four-quarter" period ranging from April 2020 to March 2021—one year.  He does not explain why this is the period he chose, *see generally* Scourtis Decl., and State Farm points out that it is different from the three-quarter impact period the same expert employed in *Rejoice! Coffee Company, LLC*, where similar claims were made.  *See* Defendant's Reply ("Reply") [Dkt. No. 89] 2.  State Farm's expert, on the other hand, considered its profits and loss ratios and severities between April 2020 to June 2022.  *See generally* Watkins Decl.

Ultimately, the dispute over whether profits should be analyzed over four quarters or nine is immaterial.  Regardless of whether I consider State Farm's profits up until March 2021 or June 2022, the results are functionally the same.  Ultimate loss and DCCE ratios for State Farm BOPs worsened after March 2020; they were predicted to be higher than pre-COVID averages in every quarter except 2021 Q1, which is presumably why Boobuli's would like to end the COVID Impact Period at 2021 Q1.  State Farm could not have earned an underwriting profit for any of the quarters between March 2020 and June 2022 except Q1 2021, because in each quarter, its loss and DCCE ratios were higher than the maximum possible ratio where State Farm can make an underwriting profit.  *See* Watkins Decl. 23:24-24:4.

A recent decision by the DOI confirms that State Farm experienced underwriting losses, not profits, during the COVID pandemic.  On October 26, 2023, the DOI stated—in response to State Farm's request for a rate adjustment—that State Farm's loss ratios were such that it qualified to increase the overall rate for its BOPs by 35.7% to offset the losses it experienced.  *See* Reply 5, n. 4; *see also* Watkins Rebuttal Report [Dkt. No. 89-2]5:10-14; Supp. RJN [Dkt. No. 89-3] Ex. 1.[10]  This decision and the data underlying it undercuts Boobuli's UCL and unjust enrichment

---

[10] State Farm supplemental request for judicial notice is GRANTED.  Def.'s Supp. RJN [Dkt. No. 89-3].  The DOI's "Objection Responses 10-26 Final.pdf" is publicly filed in SERFF Filing

United States District Court
Northern District of California

claims because it shows that there were no "excess premiums" that it retained unfairly.

Boobuli's also contends that State Farm's version of its profits during the class period is wrong because claims arising from "civil unrest" should not be included in the analysis. It argues that the correct way to assess profits during COVID is to consider solely liability rather liability and property losses.

Boobuli's arguments are inconsistent with the purpose, terms, and scope of State Farm's policies. Only considering liability claims when calculating State Farm's profits makes little sense given the nature of State Farm's BOPs, which cover both liability and property losses. *See supra* "Discussion" at 6:23-7:2. Boobuli's expert, Peter Scourtis's declaration at Exhibit C shows that per his calculations, State Farm's loss ratios are lower in the COVID Impact Period compared to the average loss ratios in Watkins' pre-COVID baseline. . *See* Scourtis Decl. Ex. C (showing). This contradicts Watkins' conclusions about loss ratios and State Farm's corresponding underwriting losses. But Scourtis did not include property losses in his analysis. His declaration does not present the whole picture; it is insufficient to create a material dispute of fact about State Farm's profits on BOPs over the relevant period. When both property and liability data are considered, it is undisputed that State Farm suffered underwriting losses.

**F.      The Foregoing Facts Do Not Show Unfairness Under the UCL.**

The UCL "prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'" *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 320 (2011) (quoting Cal. Bus. & Prof. Code § 17200).  "A UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices."

---

#SFMA-133375422.  Rate filings and related documents that are publicly filed with the California Insurance Commissioner are public records of which courts may take judicial notice.  *See e.g. Perryman v. Litton Loan Servicing, LP*, No. 3:14-cv-02261-JST, 2014 WL 4954674, at *3 (N.D. Cal. Oct. 1, 2014); *see also Moreland Apartments Assocs. v. LP Equity LLC*, No. 5:19-cv-00744-EJD, 2019 WL 6771792, at *3 n.3 (N.D. Cal. Dec. 12, 2019) (finding that documents that are "publicly available on government websites" are subject to judicial notice).  I will take judicial notice of the existence of "Objection Responses 10-26 Final.pdf."

United States District Court
Northern District of California

1    *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 173 (2000).  As the foregoing

2    discussion shows, Boobuli's has failed to show disputes of material fact about the elements

3    necessary to support an unfair UCL claim.

4         For a private plaintiff to possess standing to bring a UCL claim, the plaintiff must: "(1)

5    establish a loss or deprivation of money or property sufficient to qualify as an injury in fact, i.e.,

6    economic injury, and (2) show that economic injury was the result of, i.e., caused by, the unfair

7    business practice or false advertising that is the gravamen of the claim." *Kwikset*, 51 Cal. 4th at

8    322; *see also Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1019 (N.D. Cal. 2019) (stating that

9    "if Plaintiffs cannot allege both that they suffered injury in fact and that they lost money or

10   property as a result of an unlawful, unfair, or fraudulent business practice, then they lack statutory

11   standing to sue under the UCL").  The essential conditions of a claim for restitution under § 17200

12   are that (1) the defendant obtained something to which it was not entitled and (2) the plaintiff gave

13   up something which he or she was entitled to keep.  *See Benn v. All State Ins. Co.*, 569 F.Supp.3d

14   1029, 1037 (E.D. Cal. 2021) (citing *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 340 (1998)).

15        In support of summary judgment, State Farm argues that it did not gain anything to which

16   it was not entitled, and that Boobuli's did not give up anything that it was entitled to keep.  I agree.

17        For one thing, State Farm did provide premium adjustments to Boobuli's upon its renewal

18   in June 2021.  Boobuli's argues that "[a]t a minimum, [it] was entitled to 40% adjustment in

19   liability exposure amortized over renewal policy year, as State Farm General represented all

20   policyholders renewing between September 15, 2020, and September 15, 2021, would receive

21   such a premium adjustment."[11]  Oppo. 27:19-24.  But as a preliminary matter, it is possible that

22   State Farm had no obligation to provide Boobuli's with any relief, let alone the relief that it did

23   provide to its insureds.  As it has shown and Boobuli's has been unable to successfully rebut, State

24   Farm did not profit from retention of excessive premiums during the relevant time, which is the

25

26   _____

27   [11] State Farm argues that Boobuli's cannot satisfy the elements of its UCL claim because "a
     business practice authorized by the Legislature cannot form the basis of a UCL claim."  Mot. 28.
     In other words, it argues that State Farm is protected by what is colloquially referred to as the
28   UCL's "safe harbor."  I reject this argument for the reasons stated in II.B., above.

United States District Court
Northern District of California

1    only thing that would have compelled it to provide premium relief considering *Lara*'s ban on

2    retroactive relief order by the Commissioner.

3         Boobuli's insists that "the facts show that Boobuli's and the class 'lost money or property

4    and suffered injury in fact particularly because Defendants continue[d] to collect and retain

5    premiums in excess of the limitations imposed by California public policy[]'" Oppo. 27:8-11

6    (quoting Prior Order).  But the record shows otherwise.  As I explained earlier, State Farm's

7    filings with the California DOI showed that it experienced underwriting losses, not excessive

8    profits, during the COVID Impact Period—regardless of whose version of that period is

9    considered.  Boobuli's cannot show how it could recover restitution under the unfair prong of the

10   UCL because State Farm has shown—and Boobuli's has not rebutted—that it did not accrue

11   excessive profits during COVID.  As the most recent DOI decision, discussed above,

12   demonstrates, State Farm suffered underwriting losses necessitating a significant rate *increase*.

13   Watkins Rebuttal Report, p. 5:10-14; Supp. RJN,  Ex. 1.[12]

14         Because State Farm did not acquire and keep anything to which it was not entitled, nor

15   withhold something from Boobuli's, Boobuli's cannot recover restitution for its UCL claim.  *See*

16   *Benn v. All State Ins. Co.*, 569 F. Supp. 3d 1029, 1037 (E.D. Cal. 2021) (citing *Day v. AT&T*

17   *Corp.*, 63 Cal. App. 4th 325, 340 (1998)).

18         **G.      Boobuli's Cannot Show That State Farm Was Unjustly Enriched.**

19         As just discussed, State Farm experienced underwriting losses, not excessive profits,

20   during the COVID Impact Period on its BOPs, so it was not unjustly enriched from the payment of

21   Boobuli's' premiums.  This claim fails as a result.

22         **H.      Boobuli's Cannot Show That State Farm Breached the Implied Covenant.**

23         As shown above, State Farm responded to the COVID pandemic and directions of the

24

25   ───────────────

[12] Boobuli's also seems to contend that State Farm's response to the Bulletins resulted in some
26   policyholders receiving unfair or inequitable premium relief.  It protests that "customers such as
     Plaintiff who did not renew for a full year, did not receive the full relief, which would have been
27   amortized over the payments reduced for a full year, not just for two months, as was the case for
     Plaintiff." Oppo. 27:16-18.  But Boobuli's points to no policy language or California law
28   suggesting that insured parties are entitled to premium relief or refunds on policies that it has since
     cancelled.

United States District Court
Northern District of California

1   Insurance Commissioner by reducing its premiums by 40% for one year at renewal.  It suffered

2   underwriting losses on its Businessowners policies.  On this record, Boobuli's cannot show a lack

3   of good faith and fair dealing.

4           Boobuli's theory for this claim is that State Farm breached the covenant of good faith and

5   fair dealing inherent in Paragraph 9.d of its 2019 and 2020 policies with State Farm and statements

6   made by State Farm in relation to this provision.  This paragraph gives State Farm the discretion to

7   adjust premiums if its customers experience changed circumstances, which Boobuli's did not with

8   respect to the approved ratemaking mechanism State Farm employed for its BOPs.  It asserts that

9   for the 2019 Policy and the 2020 Policy, State Farm has "failed to return to Plaintiff any portion of

10   the premium paid for coverage between March 20 and May 31, 2020," which it argues has

11   disappointed its legitimate expectations of "having premiums collected . . . that are limited to no

12   more than a fair rate of return, and to have that rate adjusted if it became excessive."  SAC ¶¶ 98-

13   100.  It contends that State Farm breached its duty of good faith and fair dealing by: "(1)

14   unreasonably failing to exercise its discretion to audit Plaintiff's policy at any time and to make

15   adjustments to Plaintiff's premiums; (2) failing to return excess premium payments at the end of

16   Plaintiff's policy year; (3) failing to take actions directed by the California Department of

17   Insurance regarding the refund of Plaintiff's premiums; (4) failing to adhere to the representations

18   State Farm itself made to the Department of Insurance; and (5) failing to provide Plaintiff with the

19   directed notice of State Farm's obligation to provide premium relief."  SAC ¶ 102.

20           Paragraph 9.d provides:

21           Undeclared exposures or change in your business operation,
        acquisition, or use of premises may occur during the policy period

22           that are not shown in the Declarations. If so, we may require an
        additional premium. That premium will be determined in accordance

23           with our rates and rules then in effect.

24           When you request changes to this policy, or the information or factors
        used to calculate the premium for this policy changes during the

25           policy period, we may adjust the premium in accordance with the
        change during the policy period and you must pay any additional

26           premium due within the time we specify.

27   Def.'s RJN Nos. 2 (Dkt. No. 23-2, Ex. B).  This paragraph does not support Boobuli's claim

28   because the language simply provides discretion for adjustments, and only in the case of changed

United States District Court
Northern District of California

20

circumstances for the insured party. *See* Mot. 25. And even if the language were to be read in such a way that implied an obligation to make discretionary downward premium adjustments during the policy term, those adjustments would still have to be made pursuant to the rules in the policy.

Boobuli's did not qualify for a different premium under State Farm's ratemaking system because the Policies were rated based on personal property, and Boobuli's' personal property did not change during the pandemic. *See supra* I(D). Two things could trigger State Farm's discretion to adjust premiums, according to Paragraph 9.d, and neither occurred. Boobuli's never requested changes to its personal property rating during the policy term. *See* Billings Decl., ¶ 9; M. Moniz Dep. at 34:2-13; T. Moniz Dep. at 60:7-20. And despite what Boobuli's argues to the contrary, the "information or factors" used to calculate the premium did not change during the pandemic. *See* Billings Decl. Ex. 1, p. 2; Mot. 13-14; T. Moniz Dep. at 25:17- 24 (listing the personal property Boobuli's had insured before the pandemic); *id.* at 41:19-43:9 (stating the equipment was still there in November 2020).

Boobuli's contends that State Farm considers more than just personal property when calculating premiums, and that those other factors *did* change throughout COVID, necessitating a discretionary rate adjustment to maintain compliance with California public policy. Oppo. 13-15 ("[A]dditional factors beyond the amount of personal property in the insured's premises were used to determine the premium amount paid by Plaintiff."). But Boobuli's does not identify what other factors State Farm considers—in addition to personal property—that changed during the pandemic. And this is again an impermissible challenge to State Farm's ratemaking, not a challenge to how State Farm applied its approved rates. Ratemaking arguments are within the exclusive jurisdiction of the DOI Commissioner. *See Villanueva v. Fid. Nat'l Title Co.*, 11 Cal. 5th 104 (2021) (if conduct is affirmatively authorized by the Insurance Code, then immunity applies); *see supra* I(A).

Boobuli's also asserts that State Farm breached the implied covenant by failing to audit its books and records and adjust premiums accordingly. The audit provision in question only applies to estimated rates, not fixed rates like Boobuli's premiums. Dkt. No. 23-2, Ex. A, 115 (State Farm

Policy ¶ 11, providing "this policy is subject to audit if a premium designated as an estimated premium is shown in the Declarations.").  Boobuli's does not address this point in its papers or show that its premium was designated as an "estimated" premium.  *See generally* SAC, Oppo. Moreover, State Farm classifies Boobuli's business as a Delicatessen, which falls under Statistical Class #459.  *See* Watkins Decl. 29, n. 36 (citing Whetsell Decl. p. 20).  Those businesses that fall under Statistical Class #459 use the business Personal Property limit as the exposure basis to calculate liability premiums, as discussed above.  State Farm does not conduct premium audits for risks that use the personal property limit to calculate liability premiums; such changes are made when policyholders request changes to their personal property limit.  *Id.* 29:25-30:7. Boobuli's never made such a request.

Fundamentally, this claim fails like all the others.  Boobuli's has failed to show evidence that would support a jury finding that State Farm had obligations to provide benefits, based in the terms of the parties' contract, that it unreasonably withheld.  This is fatal to its breach of the implied covenant claim.

**CONCLUSION**

For the reasons set forth above, summary judgment is GRANTED to State Farm on all claims and judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: January 24, 2024

_____
William H. Orrick
United States District Judge